# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 17-830


**STATE OF LOUISIANA, ET AL.**

**VERSUS**

**THE LOUISIANA LAND AND EXPLORATION CO., ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 82162
HONORABLE JEROME M. WINSBERG, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN E. CONERY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and John E. Conery, Judges.

**Thibodeaux, Chief Judge, dissents and assigns written reasons.**

**AFFIRMED.**

**Jerold Edward Knoll**
**The Knoll Law Firm, L.L.C.**
**Post Office Box 426**
**Marksville, Louisiana  71351**
**(318) 253-6200**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **State of Louisiana**
     **Vermilion Parish School Board**

**Russell Karl Zaunbrecher**
**Edwards, Stefanski & Zaunbrecher**
**Post Office Drawer 730**
**Crowley, Louisiana  70527**
**(337) 783-7000**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **State of Louisiana**
     **Vermilion Parish School Board**

**Grady Joseph Abraham**
**Attorney at Law**
**5040 Ambassador Caffery Parkway, Suite 200**
**Lafayette, Louisiana  70508**
**(337) 234-4523**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **State of Louisiana**
     **Vermilion Parish School Board**

**William R. Coenen, III**
**Talbot, Carmouche & Marcello**
**17405 Perkins Road**
**Baton Rouge, Louisiana  70810**
**(225) 400-9991**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **State of Louisiana**
     **Vermilion Parish School Board**

**Calvin Eugene Woodruff, Jr.**
**Cooper & Woodruff**
**220 South Jefferson Street, 3rd Floor**
**Abbeville, Louisiana  70510**
**(337) 898-5777**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Vermilion Parish School Board**

**Louis Victor Gregoire, Jr.**
**Kean, Miller LLP**
**400 Convention Street, Suite 700**
**Baton Rouge, Louisiana  70802**
**(225) 387-0999**

**COUNSEL FOR DEFENDANTS/APPELLEES:**
    Chevron Midcontinent, L.P.
    Chevron USA, Inc.
    Carrollton Resources, LLC
    Union Exploration Partners, LP
    Union Oil Company of California
    (collectively, "UNOCAL")

**Kevin Wade Trahan**
**Ottinger, Hebert, L.L.C.**
**Post Office Drawer 52606**
**Lafayette, Louisiana 70505**
**(337) 232-2606**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    Chevron Midcontinent, L.P.
    Chevron USA, Inc.
    Carrollton Resources, LLC
    Union Exploration Partners, LP
    Union Oil Company of California
    (collectively, "UNOCAL")

**Michael R. Phillips**
**Kean, Miller LLP**
**909 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70112**
**(504) 585-3050**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    Chevron Midcontinent, L.P.
    Chevron USA, Inc.
    Carrollton Resources, LLC
    Union Exploration Partners, LP
    Union Oil Company of California
    (collectively, "UNOCAL")

**Robert E. Meadows**
**King & Spalding, LLP**
**1100 Louisiana Street, Suite 4000**
**Houston, Texas 77002**
**(713) 751-3200**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    Chevron Midcontinent, L.P.
    Chevron USA, Inc.
    Carrollton Resources, LLC
    Union Exploration Partners, LP
    Union Oil Company of California
    (collectively, "UNOCAL")

**Thomas E. Balhoff**
**Roedel Parsons Koch Blache Balhoff & McCollister**
**8440 Jefferson Highway, Suite 301**
**Baton Rouge, Louisiana  70809**
**(225) 929-7033**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Louisiana Department of Natural Resources**

**CONERY, Judge.**

In this oilfield remediation case, the Vermilion Parish School Board (VPSB), in its own right and on behalf of the State of Louisiana, appeals a judgment dated November 3, 2016, adopting the Louisiana Department of Natural Resources' (LDNR) most feasible plan for remediation of property damaged by oil and gas exploration and production on Section 16 property in Vermilion Parish owned by the State of Louisiana and managed by VPSB.[1] Additionally, the judgment attaches as Exhibit B, by reference only, twenty-seven written questions VPSB sent to LDNR about the plan and LDNR's answers, and makes them part of the record. The LDNR final plan obligates the defendant/appellee, Union Oil Company of California (UNOCAL), to pay for and perform the remediation work required by the plan. VPSB argues that the twenty-seven questions and answers should have been made part of the LDNR plan itself and part of the judgment, not simply part of the record. VPSB further argues that it is the proper party to be obligated to perform the remedial work ordered in the judgment. For the following reasons, we affirm the trial court judgment in its entirety.

**Facts and Procedural History**

The property at issue is owned by the State of Louisiana and managed by VPSB. The property consists of 1200 acres of mostly submerged wetlands located in the southern part of Vermilion Parish, approximately twelve miles north of the

---

[1] *See Ebey v. Avoyelles Parish Sch. Bd.*, 03-765, p. 8 (La.App. 3 Cir. 12/17/03), 861 So.2d 910, 915, for a discussion on the authority of school boards to manage Section 16 property owned by the State, in which the court concluded that:

> Section 16 lands are held in trust by the State and managed by school boards 'in the manner of a statutory trustee' for the benefit of public education. The School Board 'shall have the right to administer and use the property for public school purposes,' subject to statutory regulations regarding its sale or lease. La.R.S. 41:638; La.R.S. 41:631 et seq.

Gulf of Mexico and one-half mile east of White Lake and can only be accessed by boat. UNOCAL or its assigns performed oil and gas exploration and production activity for over fifty years on the property.

VPSB filed suit against UNOCAL and others in 2004 for environmental damage to the property.[2] VPSB included in its suit, and subsequent amended petitions, a demand for specific performance seeking to have the court order UNOCAL, et al. to remediate or "clean up" oil field waste and contamination on the property. In 2013, this case was before us on an appeal from a partial summary judgment limiting damages to the actual cleanup costs. *See State v. La. Land and Exploration Co.*, 10-1341, 11-843, 11-1016 (La.App. 3 Cir. 2/1/12), 85 So.3d 158. Pertinent to this discussion, a panel of this court held that a landowner could "recover remediation damages in excess of those provided under the feasible plan" for remediation. *Id*. at 162. Our opinion was affirmed by the supreme court in *State v. La. Land and Exploration Co*., 12-884 (La. 1/30/13), 110 So.3d 1038, and the case was remanded to the trial court for trial on the merits on all issues.

**Background**

The factual background of this case and the legislative history and purpose of the Oilfield Remediation Statute, commonly referred to as "Act 312" and codified in 2006 as La.R.S. 30:29, which we are applying herein, was covered in detail in our and the supreme court's earlier decisions and were reviewed at some

---

[2] VPSB filed suit against other defendants in addition to UNOCAL; this appeal only pertains to the judgment in favor of VPSB against UNOCAL. VPSB also asserted private claims for damages in addition to the remediation claims. The private claims were not addressed in the trial court judgment at issue in this appeal and are not before us.

length in the supreme court opinion.[3] The supreme court stated in *La. Land and Exploration Co.*, 110 So.3d at 1048-53 (footnotes omitted) (alteration in original):

> We noted [in *Corbello v. Iowa Prod.*, 02-826 (La. 2/25/03), 850 So.2d 686,] the legislature had not implemented "a procedure to ensure that landowners will in fact use the money [for remediation costs] to clean the property." [*Corbello*, 850 So.2d at 699.] We recognized the two opposing public policy concerns which the then-existing state of the law created. At that time, a landowner suing for remediation of contaminated land could sue and receive remediation damages, yet was under no obligation to use the damage award to restore the property. At the same time, there was a strong possibility that land would remain polluted if landowners could not bring suit for remediation. *Id.* [at 701].

> *Interpretation of La. R.S. 30:29*

> In *Corbello*, we observed plaintiffs who were awarded remediation damages were under no statutory obligation to perform remediation work. The purpose of Act 312 was to create such an obligation. In Act 312, the legislature provided a mechanism whereby the landowner does not receive that portion of the remediation award needed to fund the statutorily mandated plan to remediate the property to a point that protects the public's interest. As the following analysis will show, Act 312 ensures the damages awarded for remediation will be used only for remediation **to the extent necessary to fund the statutorily required plan**, into which the La. DNR has input, and which is ultimately approved by the court.

> We agree with the court of appeal the language of Act 312 is clear and unambiguous. We will presently describe each section of the Act, but its overall effect is this: The procedure described under the Act does not interfere with private rights, whether they arise contractually or by law. The procedure under the Act does not prohibit the award of remediation damages for more than the amount necessary to fund the statutorily mandated feasible plan, nor does the procedure described in the Act intrude into the manner in which remediation damages are determined. The Act makes no changes to the normal trial procedures established by the Code of Civil Procedure. The only change accomplished by Act 312 is how the damages to remediate property are spent. Under Act 312, landowners do not receive that portion of the remediation damages award needed to fund the statutorily mandated feasible plan; these funds must be deposited into the registry of the court. Finally, although the La. DNR has input into the plan to remediate the property, the final decision as to the

---

[3] *See La. Land and Exploration Co.*, 85 So.3d 158. *See also La. Land and Exploration Co.*, 110 So.3d 1038.

remediation plan adopted rests with the court. Throughout the remediation process, the court remains the gatekeeper to ensure the purpose of the Act is accomplished—remediation of the property to the extent of the public's interest. . . .

Subsection C of the statute sets forth the additional, mandated procedures to be used for the determination of a remediation plan post-trial, as well as the appellate review of those determinations. . . . If at trial the finder of fact determines environmental damage exists and determines the party or parties who caused the damage or who are otherwise legally responsible for the damage, the court orders the party or parties responsible to develop a remediation plan to be submitted to the court and the department. Deadlines are provided for such submissions in the statute. *Id.* The plaintiff and any other party are allowed to submit remediation plans to the department. *Id.*

Thereafter, the department holds a public hearing on the submissions. La. R.S. 30:29(C)(2). Within a time set by the statute, the department determines, based on evidence submitted, the most feasible plan to accomplish the evaluation/remediation of the environmental damage while protecting the health, safety and welfare of the public. *Id.* By mandating that "applicable standards" shall be used and applied in approving or structuring the most feasible plan to evaluate or remediate the environmental damage, the legislature has not limited the department to any one standard in its development of the most feasible plan. La. R.S. 30:29(C)(3). The plan approved by the department is not to be considered an adjudication subject to appellate review. La. R.S. 30:29(C)(4).

Instead, the plan approved by the department is sent to the court for its review. The plaintiff or any other party may submit its own plan, comment or input in response, within a certain time frame. La. R.S. 30:29(C)(1). **Unless a party proves by a preponderance of evidence that another plan is a more feasible plan, the court shall adopt the plan approved by the department.** If the court enters a judgment adopting a plan other than the one approved by the department, the court shall assign written reasons. Once a plan is determined, the court shall order the party or parties admitting responsibility or found legally responsible by the court to fund the implementation of the plan. In making this determination, the court will decide how much of the damages are to be used for remediation of the property. La. R.S. 30:29(C)(5). (Emphasis added.)

The court's judgment adopting a plan of evaluation or remediation and ordering the legally responsible parties to deposit funds into the court's registry shall be considered a final judgment for appeal purposes. La. R.S. 30:29(C)(6)(a).

UNOCAL conceded it caused environmental damage to the property.[4]  After a lengthy jury trial on damages and remediation costs in April and May of 2015, the jury returned a 3.5 million dollar verdict in favor of VPSB and against UNOCAL for environmental damages to the property.  We do not have the trial court record of that decision and the merits of that decision are not before us.  The issues in this appeal concern only the procedural implementation of the remediation obligation of UNOCAL pursuant to Act 312, La.R.S. 30:29, which governs how monetary awards for environmental damages are spent.[5]

As discussed by the supreme court, infra, and as specifically set forth in the 2006 version of the statute at issue, first, a defendant who has admittedly caused, or has been found to have caused, environmental damage to property must submit a plan for remediation of the damage to the LDNR.  La.R.S. 30:29(C)(1).  The plaintiff may also submit a plan for the LDNR's consideration.  La.R.S. 30:29(C)(1).  The LDNR then conducts a public evidentiary hearing.[6]  La.R.S. 30:29(C)(2)(a).  After the hearing, the LDNR considers any plans properly submitted and ultimately issues its own plan, which may or may not approve and adopt all or part of either submitted plan.  The LDNR plan must be the plan it finds to be the "most feasible plan" within the meaning of La.R.S. 30:29(C)(2)(a).[7]

---

[4] *See State v. La. Land and Exploration Co.*, 85 So.3d 158.

[5] *Id.*

[6] In the case before us, "LDNR employees with relevant technical backgrounds sat as a panel" from March 2-4 and March 7-10, 2016.  At a public hearing for that purpose, the panel heard the testimony of eight experts, five offered by UNOCAL and three by VPSB.  Numerous exhibits were shown to the panel during the hearing and admitted into the record.

[7] Louisiana Revised Statutes 30:29(C)(2)(a) states, in pertinent part:

Within sixty days from the last day on which any party may provide the department with a plan, comment, or response to a plan as provided in Paragraph (C)(1) of this Section, the department shall conduct a public hearing on the plan

5

In July 2016, the LDNR panel released its final remediation plan for the property in question. The plan addressed six separate areas of soil and sediment contamination and seven areas of groundwater contamination. In areas where data was sufficient, the plan recommended how and to what degree each section was to be remediated. In areas where the data was insufficient, the plan required additional testing and evaluation. It also estimated the cost of implementing the plan as written at one million four hundred eleven thousand, one hundred and ninety dollars ($1,411,190.00). Its estimate did not include costs of remediation once the required additional evaluations were performed and sufficient data was received. The plan ordered UNOCAL to fund and perform the remediation work as set forth in the plan.

VPSB did not directly challenge the LDNR plan or request an additional preponderance hearing under La.R.S. 30:29(C)(5).[8] Instead, VPSB sent twenty-seven written questions to LDNR after the plan was released that sought interpretation and clarification of the plan. The LDNR panel answered these questions in writing and specifically conditioned their use **as a clarification tool only**. LDNR made clear that "[w]hile **these answers do not alter the MFP** [(most

---

or plans submitted. . . . Within sixty days of the conclusion of the hearing, the department shall approve or structure a final plan . . . based on the evidence submitted which the department determines to be the most feasible plan to evaluate or remediate the environmental damage and protect the health, safety, and welfare of the people. The department shall issue written reasons for the plan it approves or structures.

[8] Louisiana Revised Statutes 30:29(C)(5) provides:

The court shall adopt the plan approved by the department, unless a party proves by a preponderance of the evidence that another plan is a more feasible plan to adequately protect the environment and the public health, safety, and welfare. The court shall enter a judgment adopting a plan with written reasons assigned. Upon adoption of a plan, the court shall order the party or parties admitting responsibility or the party or parties found legally responsible by the court to fund the implementation of the plan.

feasible plan)] in any way, we are hopeful they will provide the requested and desired clarity to the MFP." (Emphasis added).

The parties then filed competing motions to adopt their respective proposed judgments as the court's most feasible plan. Both proposed judgments adopted the LDNR plan as the judgment of the court. However, the parties disputed specific language in the proposed judgments, and their motions to adopt were set for hearing. At the "judgment hearing," the pertinent issues presented to the trial court for its consideration were: (1) whether and/or how to incorporate the written questions and answers between VPSB and LDNR into the judgment and; (2) which party should perform the remediation and evaluations recommended in the plan. Counsel for both parties participated in the hearing and were given more than ample opportunity to argue their respective positions to the trial court. During the hearing, the trial judge made clear that the questions and answers provided by LDNR to Plaintiffs, at their request, "should be part of the record, but they do not alter the plan as indicated by LDNR. **They do not alter the plan in any way.**" (Emphasis added).

Ultimately, the trial court rendered judgment on November 3, 2016, adopting the LDNR plan as written and attached the written questions and answers as Exhibit B to the judgment and made them part of the record. The judgment further obligated UNOCAL to **fund and perform the remedial work and evaluations set forth in the plan.** VPSB filed a timely appeal. Finding the trial court's ruling was legally correct, we affirm.

## Assignments of Error

VPSB alleges the trial court erred by:

7

1)        Denying the Motion to Adopt VPSB's Proposed Form of Judgment Regarding Most Feasible Plan.

2)        Granting Unocal's Motion to Enter Judgment Regarding Most Feasible Plan.

3)        Entering a Judgment on November 3, 2016 allowing Unocal to implement the work identified in the [M]ost [F]easible [P]lan.

4)        Denying the VPSB's request to implement the work identified in the Most Feasible Plan.

5)        Failing to comply with the [s]upreme [c]ourt's ruling in *State v. Louisiana Land and Exploration Co.*[, 12-884 (La. 1/30/13), 110 So.3d 1038.]

## Standard of Review

We review La.R.S. 30:29 cases under the de novo standard of review. La.R.S. 30:29(C)(6)(b). In performing a de novo review, "the appellate court must review the record in its entirety, giving no special weight to the trial court's determinations." *Kyle v. Kier*, 17-134, 2017 WL 5477806, at *8-9 (La.App. 3 Cir. 11/15/17). "[U]nder the de novo standard of review, the appellate court . . . review[s] the record in its entirety to determine whether the trial court's decision was legally correct in light of the evidence." *Domingue v. Bodin*, 08-62, p. 2 (La.App. 3 Cir. 11/5/08), 996 So.2d 654, 656 (citations omitted). In our review, we may either "affirm the trial court's adoption of a plan or may adopt a feasible plan in conformity with this Section and shall issue written reasons for [our] decision." La.R.S. 30:29(C)(6)(c).

## Law and Discussion

Assignments of Error Numbers 1-4 all address the same legal issue and will be considered together.

Louisiana Revised Statutes 30:29(C)(5) (emphasis added) states, in pertinent part:

8

The court **shall** adopt the plan approved by the department, **unless** a party proves by a preponderance of the evidence that another plan is a more feasible plan to adequately protect the environment and the public health, safety, and welfare.

We find this language to be clear and unambiguous.[9] Absent proof by a preponderance of the evidence that another plan is more feasible than the LDNR's plan, La.R.S. 30:29(C)(5) mandates that the court adopt the LDNR plan. In this case, the evidentiary hearing required before the trial court could adopt another plan was never requested (and therefore never took place).

There is no statutory authority for VPSB to modify LDNR's plan by attacking the trial court's form of judgment. However, even though VPSB did not timely object to the LDNR plan and request a "preponderance hearing" in accordance with La. R.S. 30:29(C)(5), the trial judge nevertheless did in fact conduct a lengthy contradictory hearing at which it heard extensive argument on whether to adopt the VPSB proposed judgment in this case.

After thoughtfully considering all of the concerns and arguments put forth by VPSB, the trial court decided to adopt the LDNR plan as the most feasible plan. It also allowed the clarification questions that VPSB had asked to LDNR and LDNR's answers to be attached to LDNR's plan as well as to the trial court's judgment. In its oral reasons, the trial court made it clear. "While LDNR's answers to VPSB's questions do not alter the most feasible plan in any way, as LDNR acknowledges, the answers clarify the most feasible plan." Hence the questions and answers at issue are already attached to the trial court's final judgment and we agree with the trial court that the questions and "answers clarify the most feasible plan."

---

[9]*La. Land and Exploration Co.*, 110 So.3d 1038.

Keeping in mind that LDNR and the trial court maintain jurisdiction to conduct additional hearings and issue supplemental rulings, and after full de novo review, we find no error in the trial court's decision to adopt the form of judgment proposed by UNOCAL with the VPSB questions and LDNR's answers attached to the judgment at issue.

**Performance of Remediation Work by UNOCAL:**

VPSB strenuously argued at its requested hearing on the form of the judgment that the trial court adopt its proposed form of judgment ordering VPSB to perform the remediation in the LDNR plan. No evidence was presented on this issue, only argument by counsel. We need not decide here whether this hearing was a "preponderance hearing" required by La.R.S. 30:29(C)(5) or not. The one-hundred plus page transcript of the attorneys' arguments in the trial court on this issue fully demonstrates that the trial judge conducted a contradictory hearing and thoughtfully considered all of VPSB's concerns about UNOCAL's actually performing the work discussed in the plan and its request that it be authorized to perform the remediation.

One of the main purposes of Act 312 was to remove from the landowner the right to receive a portion of the remediation damages and require the party at fault to fund remediation of the environmental damages caused by its operation on a landowner's property. As a panel of this court stated in *Savoie v. Richard*, 13-1370, pp. 8-9 (La.App. 3 Cir. 4/2/14), 137 So.3d 78, 86, *writ denied*, 14-1283, 14-1287 (La. 11/14/14), 152 So.3d 880 (emphasis added), "[t]he remedy for remediation to state regulatory standards is no longer a private money award, but rather **specific performance of the remediation** to those state standards that serve the public interest."

10

Nevertheless, VPSB alleges the portion of the judgment in this case specifically obligating UNOCAL to **perform** the work set forth in the plan, separate and apart from any obligations contained within the plan, is in error. VPSB's assertions that they should be allowed to perform the work is not supported by statutory law, jurisprudence, or by the LDNR final plan adopted by the trial court. VPSB has not cited any cases in which the plaintiff was obligated to perform the work set forth in the plan and no independent review revealed any. In fact, in this case, the supreme court earlier stated in its opinion that the lessee is responsible for cleaning up its messes:

> [T]he duty to remediate oilfield containment exists under the prudent operator standard of the Mineral Code by virtue of our holding in [*Terrebone Parish Sch. Bd. v.*] *Castex*, [04-968 (La. 1/19/05), 893 So.2d 789], and it certainly exists under the Civil Code. The holding in *Castex* merely recognized that in absence of unreasonableness or excessiveness, the lessee has the duty to restore the surface minus normal wear and tear.

*La. Land and Exploration Co.*, 110 So.3d at 1057, (quoting *Marin v. Exxon Mobil Co.*, 09-2368 (La. 10/19/10), 48 So.3d 234, 259-60).

Additionally, the plan itself specifically calls for UNOCAL to perform the work.[10] In adopting the LDNR plan as the court's judgment, the trial court necessarily adopted those provisions specifying UNOCAL implement the remediation work. Even if the trial court's judgment did not explicitly state that UNOCAL was to perform **all** the remedial work, compliance with the provisions of the plan as adopted would produce the same result.

Insofar as VPSB references actions taken by either party in furtherance or delay of the plan's implementation, we cannot consider these allegations. We are

---

[10]*See* pages 31, 34, 38-40, 43, and 46-51 of LDNR's final plan.

limited to a review of the record available to the trial court at the time it rendered its decision. *See State v. Hoffpauir, 2017 WL 4987661 at \*5 (quoting Titlesite, L.C. v. Webb, 36,437, p. 12 (La.App. 2 Cir. 12/11/02), 833 So.2d 1061, 1068-69).*[11]

The statute itself provides for the procedures by which VPSB can insure that the remediation is done properly. Louisiana Revised Statutes 30:29(F) provides: "[t]he court and the department shall retain oversight to ensure compliance with the plan. The party or parties admitting responsibility, or the party or parties found legally responsible by the court **shall file progress reports periodically as the court or the department may require.**" (Emphasis added.) Since the trial judge and LDNR have continuing jurisdiction over implementation of the plan, any concern that VPSB may have as to the performance of the remediation work by UNOCAL can be brought to LDNR's and the trial court's attention in subsequent proceedings. The record reveals that at the time the trial judge signed the judgment approving the plan, it was fully aware of the concerns of VPSB as to whether UNOCAL would properly implement the plan. The trial judge specifically allowed the "questions and answers" between VPSB and LDNR to form part of the record and attached it to its judgment for further clarification during the plan's implementation. Continuing jurisdiction allows LDNR and the trial judge to maintain and control the plan's implementation and issue such subsequent orders as may be appropriate. The legislature has clearly and specifically given that

---

[11] [A]n appellate court must render its judgment upon the record on appeal. The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, judgments and other rulings. The appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence. Memoranda and exhibits not filed in evidence are not part of the record on appeal. The briefs of the parties and the attachments thereto are not part of the record on appeal. Further, this court does not consider exhibits filed in the record which were not filed into evidence.

*Hoffpauir*, 2017 WL 4987661 at \*5.

authority to LDNR and the trial court, with the trial judge as the final decision maker, subject to the appellate court's de novo review. On de novo review, we find no error in the trial court's ruling.

### Assignment of Error No. 5 – Interpretation of State v. Louisiana Land and Exploration Co.:

Finally, VPSB also alleges the trial court committed legal error by not following the supreme court's earlier holding in this case in *La. Land and Exploration Co.*, 110 So.3d 1038. VPSB asserts that the supreme court "ruled that the landowner plaintiff in an Act 312 [(La.R.S. 30:29)] case has the right and obligation to perform the cleanup" (emphasis omitted). It arrives at that erroneous conclusion by taking language in the opinion out of context: "['i]n *Corbello*, we observed plaintiffs who were awarded remediation damages were under no statutory obligation to perform remediation work. The purpose of Act 312 was to create such an obligation.'" (citation omitted) (emphasis omitted). The supreme court did not rule that the plaintiff must perform the remediation work, it merely stated the obvious—the purpose of the statute was to create an obligation to remediate.

Act 312 changes only the procedure for the manner in which remediation damages are spent. The language of the statute itself does not create a right and obligation for the plaintiff to perform the remedial work, though there is likewise nothing in the statute that would specifically prohibit it. The decision on how to implement the most feasible plan is left up to LDNR and, eventually, the trial judge. The supreme court, in its earlier decision in this case, described the "overall effect" of Act 312 as:

> The procedure described under the Act does not interfere with private rights, whether they arise contractually or by law. The procedure

under the Act does not prohibit the award of remediation damages for more than the amount necessary to fund the statutorily mandated feasible plan, nor does the procedure described in the Act intrude into the manner in which the remediation damages are determined. . . . The only change accomplished by Act 312 is how the damages to remediate property are spent. Under Act 312, landowners do not receive the portion of the remediation damages award needed to fund the statutorily mandated feasible plan; these funds must be deposited into the registry of the court. . . . **Throughout the remediation process, the court remains the gatekeeper to ensure the purpose of the Act is accomplished—remediation of the property to the extent of the public's interest.**

*La. Land and Exploration Co.*, 110 So.3d 1149 (emphasis added). The trial court did not misapply the holding of the supreme court. To the contrary, the trial judge was correct to order the responsible party, UNOCAL, to "clean up its mess,"[12] all in accordance with the intent of the legislature manifested by the clear and unambiguous language of La.R.S. 30:29. If UNOCAL does not, VPSB has a right to bring any complaints it has to LDNR and the trial court, who retains jurisdiction and "remains the gatekeeper."

## CONCLUSION

After carefully reviewing the record, we find the trial court correctly applied the provisions of Act 312, La.R.S. 30:29. The trial court's judgment is affirmed in its entirety. Costs of this appeal are assessed against the Vermilion Parish School Board.

**AFFIRMED.**

---

[12] Senator Adley, introducing Senate bill 655, which eventually became Act 312 and then La.R.S. 30:29, made this comment at a hearing on the bill: "[O]il companies, you've made a mess and you've got to clean it up." S.B. 655, 2006 Leg., Reg. Sess. (La. 2006).

**THIBODEAUX, Chief Judge, dissenting.**

### *Discussion*

Of great concern in this case is that, contrary to UNOCAL's assertions, the statute does not by any of its terms state that the responsible party is to perform the actual remediation, as will be discussed fully below. Act 312 requires only that the responsible party *submit* a remediation plan to the Department, *fund* the *court's* final plan, and *file* progress reports as the court or the Department may require. *See* La.R.S. 30:29(C)(1), (C)(5), and (F), respectively.

Upon adopting its final plan, the court orders the responsible party "to fund the implementation of the plan." La.R.S. 30:29(C)(5). Funds for the court's final plan are put in the registry of the court, and the court controls the funds. La.R.S. 30:29(D)(1) and (D)(4).

Pursuant to a de novo review, there are, in my view, trial court errors that require a reversal of its judgment. The errors arise in three main categories.

### *LDNR's Plan and Its Contingencies*

While LDNR was thorough in comparing the plans submitted by UNOCAL and VPSB and in its efforts to assess the evidence from the parties' experts over a seven-day public hearing, the final plan submitted to the trial court contains far too many contingencies with no estimate of the cost of the contingencies. In short, the LDNR plan was incomplete; it repeatedly described more work that had to be done before remediation would be complete, including at least two years of monitoring, but the trial court did not require cost estimates on the additional work. As a result, no one knows, or even has a good estimate of, how much it will take to

15

remediate the land to the level required to protect the public; and no one knows how long it will take to finish the remediation.

More specifically, LDNR's plan states as follows (emphasis added):

**C.** **Cost Estimate to Implement Most Feasible Plan**

The cost estimate to implement the Plan as presently known is $1,411,190 (rounded). This includes: 1) UNOCAL's estimate to close Tank Battery B, South Pit, which LDNR accepts; 2) UNOCAL's estimate for groundwater monitoring wells, which LDNR accepts; 3) estimate for SED 15 area remediation (Table 11); 3) [sic] estimate for sampling and excavation/disposal of mercury at Tank Battery A (Table 12); 4) estimate for resampling costs (Table 13); and 4) [sic] estimate for groundwater costs (Table 14). ***This estimate does not include additional well installations*** *that may be necessary pursuant to this Plan; any* ***additional evaluation costs*** *that may be necessary from* ***additional sampling and/or further delineation*** *required by this Plan (beyond what is specifically covered in cost tables above); and/or any* ***remediation costs that may be necessary*** *based on results of sampling and/or further delineation.* ***Additional costs will depend on what sampling and/or delineation reveals***.

In LDNR's fifty-two-page plan (plus tables, charts, and graphs), there are over thirty contingencies, introduced by *if-then* phrases and phrases such as *data incomplete, information inconclusive, unclear, not established, further evaluation or remediation needed*. There were at least a dozen instances of requirements for UNOCAL *to submit* work plans, or *report* results and further evaluation or remediation needed, or *create* AOI (area of interest) figures, or *meet* with LDEQ in the future. There were four instances of *additional wells* that may be necessary, and two locations requiring *semi-annual monitoring for two years*.

Under Act 312, the trial court can accept the funding in increments, but not without requiring the defendant to post bond for the full cost of remediation. The trial court did not require a bond and accepted only the known costs associated with the LDNR plan as submitted. When VPSB asked questions about the contingencies and other unclear sections after the LDNR plan was submitted to the

court, the LDNR supplied answers that clarified some of those contingencies, but the trial court refused to incorporate the clarifying text, except for one $329,000.00 correction, before adopting the court's final plan for implementation.

More specifically, VPSB's question number 16, and LDNR's response provided as follows:

> 16. Q. *Table 12 – mercury excavation costs – Table 12 identifies a figure of $11,040,00 for the excavation of mercury in a 20'x20x3' area. The calculations at the bottom of the table identify a 44 cubic yard volume, which purportedly translates to 6.9 bbls of material, which appears to be inaccurate. The actual barrel volume would appear to be 213 bbls. If a bulking factor of 2 is included (as in the prior LDNR calculation), the true cost of the mercury excavation would appear to be $340,000.*
>
> A. The panel agrees the cost calculation for mercury excavation cost is incorrect, and VPSB's calculation is correct. This clarification here may be viewed as a sufficient correction to the MFP & Reasons on this point unless either party requests the issuance of a revised Table 12 and other page(s) incorporating the incorrect [sic] figure, which of course will be done if requested.

Based upon the foregoing $329,000.00 mistake, it is reasonable that VPSB had other concerns regarding the LDNR plan, particularly where the plan has UNOCAL, who apparently has not had a lease for oil and gas exploration on the property since 1995, in charge of all the contingencies. Of VPSB's twenty-seven questions, answer number 16 above is the only one that was incorporated into the final judgment and reflected in the final cost estimate in the judgment, changing the LDNR plan's estimate of $1.4 million to the trial court's judgment requiring a deposit of $1.7 million. Other examples of significant questions follow, and the bolded emphasis in the LDNR's answers indicates that the clarification was needed and is important to the accuracy of the final judgment implementing the plan.

> 7. Q. *Does this plan require any institutional controls or conveyance notices?*

17

A.     No.  Institutional controls or conveyance notices are not required at this time.  It is **not known** whether or not institutional controls or conveyance notices will be necessary **until site evaluation is complete, all COC's are fully delineated and UNOCAL submits its plan(s) to address any outstanding compliance issues**.

8.     Q.     *Does this plan allow Unocal to inject contaminated groundwater under the VPSB property without a surface lease and over the VPSB's objection?  Or is DNR considering onsite injection on adjacent property in the same field?*

A.     No.  This has **not been determined yet**.  Prior to making any determination, **further characterization and delineation is needed[.]**

9.     Q.     *The DNR plan says "oil sheening clearly violates LDEQ general surface water quality criteria as to aesthetics, color, floating, suspended, and settleable solids, and oil and grease."  Does this plan require cleanup of all oil sheens on the property?  Or does it just require cleanup of oil sheens generated in the SED-15 area?  See pgs. 27-28.*

A.     If there is obvious sheening at other locations besides SED-15, **the source of the sheening must be cleaned up in an appropriate manner similar to SED-15**.

. . . .

22.  Q.  *Pg. 44-45 – It is unclear as to what CDCs are being evaluated in this zone.  The plan mentions barium, benzene, and chlorides.  Is Unocal also required to look at other contaminants that exist above the applicable standards (i.e., selenium, strontium, TPH, chromium, lead)?  Numerous samples appear to have concentrations above applicable limits (e.g., SB-1, HPNIPA-08-T, TBBIS, MPA04T, etc.).*

A.     The MFP & Reasons in this 40-50 foot zone **only addressed barium, benzene, and chlorides**.  The **panel clarifies that other COCs with exceedances must be characterized, delineated, and be part of a plan of remediation**. . . .

This particular clarifying answer continues for another eleven lines of

explanation.  Note also the following:

25.  Q.  *Are concentrations at BC-3 and BC-4 (which had heavy metals and chlorides) required to be delineated?*

A.     **Although** the MFP & Reasons, pp. 49-50, dealing with BC-3 and BC-4, specifically refers to iron, barium, strontium, and

18

radium, and the reference **"other COCs" is not used**, the same comment as in No. 24 applies here. **The panel clarifies that other COCs with exceedances at BC-3 and BC-4 must be characterized, delineated, and be part of a plan of remediation as necessary and in accordance with RECAP.** Radium, and potentially strontium, is exclusively within the jurisdiction of LDEQ, as noted in the Radium section of the MFP & Reasons.

The last two questions answered by LDNR specifically leave the contingencies up to the "judgment of UNOCAL."

26. Q. *Footnote 155, pg 49, states that "the SWD's should be investigated as a possible source of benzene." What COC's is Unocal required to delineate with respect to the SWD breaches?*

A. Based on information reported to the agency at this time, the panel has suggested UNOCAL should investigate the SWDs as a potential source of benzene. **The first step should be gathering more data** to determine if the limited benzene exceedance information from BC-2 can be repeated/verified, and if the exceedance is, or appears to be present in aquifer at this sample location. **Beyond benzene, any other COCs that are helpful for purposes of determining whether a breach in a SWD is a source of the benzene in the aquifer is left to the judgment of UNOCAL at this point**. Any plan for investigation should be submitted to LDNR for review in accordance with applicable protocol for compliance with RECAP and/or Office of Conservation regulations prior to implementing any such plan. This Office will implement appropriate action should additional information submitted to the agency necessitate further investigation by UNOCAL.

27. Q. *How is Unocal to go about investigating the SWD's? Should they be required to re-enter the SWD's to determine mechanical integrity of the well bores?*

A. **Whether, or how, UNOCAL investigates the SWDs is left up to the judgment of UNOCAL at this time**. However, any plan for investigation should be submitted to LDNR for review in accordance with applicable protocol for compliance with RECAP and/or Office of Conservation regulations prior to implementing any such plan. This Office will implement appropriate action should additional information submitted to the agency necessitate further investigation by UNOCAL.

Ultimately, VPSB agreed to the LDNR plan for ultimate remediation of VPSB's property; however, VPSB at least wanted LDNR's clarifying answers on

19

the contingencies incorporated into the final plan adopted by the trial court.[13]  I agree with VPSB.  Based upon a de novo review, a preponderance of the evidence shows that the better plan for the protection of the public is the one that complies in every respect with Act 312 and ensures that all questionable areas are revealed and addressed.

In *Sweet Lake Land & Oil Co. v. Oleum Operating Co., L.C.*, 17-464, p. 2 (La.App. 3 Cir. 10/18/17), 229 So.3d 993, 996, *writ denied*, 17-1107 (La. 10/27/17), 228 So.3d 1224, this court upheld the trial court's rejection of LDNR's plan as incomplete for purposes of remediation.  There, in rejecting the plan, the trial court specifically ordered LDNR, in pertinent part, to:

> a.  address groundwater remediation on the property. ...  The final remediation plan may contain clean up options that depend upon the results of additional information and should be accompanied by an estimate of the cost to obtain the additional information.  If LDNR is unable to provide the foregoing final remediation plan, it shall provide the Court with information to help the Court better order LDNR to do what needs to be done;
>
> b.  Specify the regulation or standard for each clean up activity so that the Court can enforce it[.]

In affirming the trial court, even though an amended version of Act 312 in *Sweet Lake* provided for a preliminary plan before LDNR's final submission to the trial court, which the original version controlling this case does not, we determined that the LDNR plan, when submitted to the trial court, is final when submitted, and must be complete.  We stated that under the explicit terms of the statute, "the role of LDNR is to develop the most feasible plan and file the plan in the court record, while the role of the trial court is to adopt the plan unless evidence supports otherwise." *Sweet Lake*, 229 So.3d at 1001.  We further stated:

---

[13]The majority adopts the trial court's rationale that the questions and answers "clarify the most feasible plan."  It stops short of saying that they are incorporated into the final plan.

20

> [T]he supreme court in *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, pp. 37-38 (La. 7/1/08), 998 So.2d 16, 32, stated in *dicta*: "Finally, it is the district court who considers the various restoration plans, including any that the surface owner may choose to submit, determines which one is most feasible, and oversees the implementation of the restoration plan. La.Rev.Stat. § 30:29(C)(5)." In *State v. Louisiana Land and Exploration Co.*, 12-884, p. 16 (La. 1/30/13), 110 So.3d 1038, 1049, the supreme court explained that "although the La. DNR has input into the plan to remediate the property, the final decision as to the remediation plan adopted rests with the court. Throughout the remediation process, the court remains the gatekeeper to ensure the purpose of the Act is accomplished— remediation of the property to the extent of the public's interest."

*Id*. at 1001-02.

In *Sweet Lake*, we stated that, in the hearing before LDNR, "although Sweet Lake apparently submitted a plan, there was no evidence, much less a preponderance of evidence, as to whether its plan was more feasible than LNDR's plan. During the hearing, the experts mainly testified regarding the flaws and proper interpretation of the LDNR plan." *Id*. at 1001. That is not the case here, and we are not requiring the court to fully reject the LDNR plan and send it back. In this case, the LDNR hearing lasted seven days, and the LDNR panel heard extensive testimony and received detailed exhibits from eight experts, five for UNOCAL and three for VPSB. LDNR provided detailed reasons over fifty-two pages, with 165 footnotes, as to what it found acceptable and unacceptable in each plan submitted. There was significant evidence available to LDNR, but LDNR still submitted a plan with many, many contingencies and no estimate of costs to cover them. The language in LDNR's plan itself and the twenty-seven questions and answers *prove* that there were too many unknowns to even suggest that the cost of the remediation would be the cost adopted by the trial court to implement the remediation plan.

Here, there were apparently two court hearings discussing the unknown contingencies, LDNR's answers, which LDNR admitted by letter were clarifications to its plan, and the content of the final judgment, before the trial court issued its final judgment on the plan it found most feasible. The most feasible plan will be the clearest, most specific, most accurate, and most complete plan reasonably available. *See* La.R.S. 29:30(I)(3). Thus, in this case I think that a preponderance of the evidence shows that, at the very least, the trial court should have incorporated as an addendum the twenty-seven questions and clarifying answers in evidence before adopting the LDNR plan as "the most feasible plan." I further conclude no merit in UNOCAL's argument that VPSB had to request an additional "preponderance hearing" as neither the reference nor the requirement appears in the language of the statute.

### *The Trial Court's Judgment*

Both VPSB and UNOCAL submitted proposed final judgments for consideration by the trial court. Following a September 2016 hearing, the trial court ordered the parties to try to agree on a final judgment. They could not reach agreement. During the November 2016 hearing on the content of the judgment, the trial court adopted, in large part, the judgment drafted by the defendant, UNOCAL, the party found liable by a jury for environmental contamination of the property during the fifty-five years that it had operated oil and gas exploration thereon, from 1940 to 1995. The judgment adopted by the trial court, over repeated objections by VPSB, in some paragraphs implies that the cost to implement the Most Feasible Plan is the known costs of roughly $1.7 million.

One paragraph states that "the cost estimate to implement the Most Feasible Plan as presently known is $1,740,150.00 (rounded)." It is true that this language is based upon the first sentence of the paragraph near the end of LDNR's plan at section C, entitled, "Cost Estimate to Implement the Most Feasible Plan" as shown in full above and discussed early on in this opinion. The mathematical error has been corrected in the final judgment. But the next sentence which begins, "This includes," and the remainder of the paragraph wherein LDNR explains what *is* captured in the cost estimate and what is *not* captured in the estimate is omitted. This was a very contentious point at the November hearing on the judgment, and yet the trial court accepted UNOCAL's proposed judgment omitting specifics that LDNR clearly thought necessary to include in its plan.

The next paragraph in the trial court's judgment, states that "pursuant to La.R.S. 30:29(C)(5) and (6)(a), UNOCAL shall fund the implementation of the Most Feasible Plan by depositing . . . $1,740,150.00 . . . into the registry of the court[.]" Act 312 at La.R.S. 30:29(C)(5) does require the court to order the responsible party "to fund the implementation of the plan." But (C)(5) does not instruct the court to order the responsible party "to fund the implementation of the plan *by depositing*" any amount, much less only *part of the cost* of a plan riddled with contingencies and a plan which states by its own terms that the estimate of $1,740,150.00 does not cover specific contingencies (emphasis added):

> ***This estimate does not include additional well*** *installations that may be necessary pursuant to this Plan;* ***any additional evaluation costs*** *that may be necessary from* ***additional sampling and/or further delineation*** *required by this Plan (beyond what is specifically covered in cost tables above); and/or* ***any remediation costs that may be necessary based on results of sampling and/or further delineation. Additional costs will depend on what sampling and/or delineation reveals***.

23

In addition to adding language that is not part of (C)(5), such that the sentence implies that the amount stated will fully implement the plan, the sentence also references (C)(6)(a), which states that the judgment is final. This reinforces the implication, in one sentence, that the deposited amount will fund the plan and that this is the court's final judgment on the matter. Since there are six more paragraphs to the court's judgment, the last of which appropriately references La.R.S. 30:29(C)(6)(a), it begs the question: why the placement of (C)(6)(a) regarding finality of the judgment in an early paragraph where it has no easily discernible meaning, except to imply finality to an amount that clearly is not final?

In fact, the statute itself anticipates that a defendant's initial deposit into the registry of the court may not be enough to fully fund remediation of the subject property, and the statute provides for additional funds to be deposited. More specifically:

> The court shall retain jurisdiction over the funds deposited and the party or parties admitting responsibility or the party or parties found legally responsible by the court until such time as the evaluation or remediation is completed. If the court finds the amount of the ***initial deposit*** insufficient to complete the evaluation or remediation, the court shall, on the motion of any party or on its own motion, order the party or parties admitting responsibility or found legally responsible by the court to deposit additional funds into the registry of the court. Upon completion of the evaluation or remediation, the court shall order any funds remaining in the registry of the court to be returned to the depositor. The department and the parties shall notify the court of the completion of any evaluation or remediation.

La.R.S. 30:29(D)(4).

Following the previously discussed problematic paragraphs of the trial court's judgment, the next paragraph dealing with (D)(4), quoted immediately above, was highly contested at the hearing on the judgment. This was because the trial court would not allow VPSB's use of the phrase "initial deposit" in the

sentence specifically referencing (D)(4) two times in the sentence. The trial court's paragraph stated that, "pursuant to La.R.S. 30:29(D)(4), if the court finds that the deposited amount ($1,740,150.00) is not sufficient to fund the implementation of the Most Feasible Plan, the court shall . . . order UNOCAL to deposit additional funds into the registry of the Court in accordance with La.R.S. 30:29(D)(4)." The collective effect of the above discussed additions to, deletions from, and misplaced references to, the statutory language of Act 312 of 2006, contained in the trial court's judgment, is a final judgment that will propagate needless litigation in the future. This is particularly true where full remediation is at least two years away.

The VPSB judgment appearing in the record on pages 545-548, filed on October 19, 2016, as "Exhibit A" to VPSB's "Memorandum in Support of Motion to Adopt VPSB's Proposed Form of Judgment Regarding Most Feasible Plan" most accurately reflects the language and intent of the LDNR plan and the language and intent of La.R.S. 30:29. Accordingly, the VPSB judgment should have been accepted in its entirety, except for the minor clarifying revisions shown below.

The first revision clarifies how the VPSB questions and LDNR's letter and answers discussed above will be incorporated into the LDNR plan. Since a seamless incorporation of the answers into the original text of the plan will likely invite more litigation over the re-wording, I conclude that an addendum of the letter and the questions and answers is the most efficient and accurate way to incorporate them into the final plan adopted by the court. To that end, VPSB's judgment, on page two, in the paragraph addressing the "September 2, 2016 letter"

and the questions and answers, should add the words "by Addendum" inserted after the existing words "will be incorporated."

The next clarification is in the first full paragraph on page three of VPSB's proposed judgment. The reference to "La.R.S. 30:29(D)(1)" should instead be "La.R.S. 30:29(D)." The third full paragraph on page three should end with ", pursuant to La.R.S. 30:29(D)(3)." The fourth full paragraph should end with ", pursuant to La.R.S. 30:29(D)(4)." The fifth full paragraph should end with ", pursuant to La.R.S. 30:29(F)." The sixth full paragraph on page three should end with ", pursuant to La.R.S. 30:29(D)(4)." The first paragraph on page four should delete "is obligated to" and insert "shall" in its place, for reasons more fully discussed below.

### *Actual Performance of the Remediation Work*

The trial court accepted UNOCAL's argument that Act 312 not only required UNOCAL to fund the remediation, but it also required UNOCAL to actually perform the remediation work on the property. That is a false assertion. Act 312, enacted as La.R.S. 30:29 on June 8, 2006, does not specify who must do the work. The cases cited by UNOCAL involved current operators and leaseholders who were operating on the subject property under leases they had paid for. Moreover, none of those cases held that Act 312 required the responsible party to perform the remediation work. In this case UNOCAL has no lease, and it has no incentive to remediate the property on any timetable except its own; nor does it have an incentive to readily comply with LDNR's requirements without arguing every point.

26

Where UNOCAL has no interest in the property and stands to recover unused funds from its deposits into the registry, its primary business incentive will be to spend as little as possible, argue against every requirement to deposit more money, and find ways to get as much refunded from the registry as possible. It was not the intent of the Act or the legislature to require a defendant, especially one in UNOCAL's position, to perform the actual remediation work. In fact, the 308-page hearing transcript of May 17, 2006, wherein testimony regarding Senate Bill 655 (Act 312) was given before the Natural Resources Committee, contains no argument over language requiring a particular party to do the actual work— because such language was not in the bill. There were many arguments, as testimony was given by landowners, oil companies, LDNR, lawyers, and environmental engineers. There were arguments about technical requirements, applicable standards, the role of the courts; and some discussions contained comments such as "make them [the oil companies] clean up their messes" or "require them [the landowners] to use their court awards to clean up their property." But none of those comments or arguments were about language requiring the wrong party, or any party, to actually perform the remediation work.

In this case, VPSB has the greater incentive to quickly remediate its property because it is losing money every day the contamination exists. That is in part because VPSB is having to cancel the hunting and fishing leases that it has issued to its paying leaseholders. While the 2006 legislature did not state which party should perform the remediation work, VPSB argues that the Louisiana Supreme Court places that obligation on the landowner. VPSB cites language from an earlier appeal in this case, wherein the supreme court affirmed this court's findings that Act 312 does not cap the landowner's damages to the limited remediation to

27

state agency standards when the landowner's lease with the oil company provides for a higher remediation standard.  It is the supreme court's most recent and most in-depth decision on the statute.   The supreme court starts with the rules of legislative interpretation, which are certainly applicable herein:

> When there is long-standing interpretation of a legal issue or several laws on a particular subject matter, we must also give due regard to the well-settled rules of statutory construction succinctly set forth in *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 2007-2371, p. 13-14 (La.7/1/08); 998 So.2d 16, 27:
>
>> It is also well established that the Legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject. [*State v.*] *Johnson*, [2003-2993 (La.10/19/04);] 884 So.2d [568] at 576; *State v. Campbell*, 03-3035 (La.7/6/04), 877 So.2d 112, 117.   Thus, legislative language will be interpreted on the assumption the Legislature was aware of existing statutes, well established principles of statutory construction and with knowledge of the effect of their acts and a purpose in view.  *Johnson*, 884 So.2d at 576-77; *Campbell*, 877 So.2d at 117.  It is equally well settled under our rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter.   La. Civ.Code art. 13; *City of New Orleans v. Louisiana Assessors' Retirement and Relief Fund*, 05-2548, 986 So.2d 1 (La.10/1/07).

*State v. Louisiana Land & Expl. Co.*, 12-884, p. 9 (La. 1/30/13), 110 So.3d 1038, 1045.

The court then gave a history leading to Act 312 in 2006 and the purpose of La.R.S. 30:29 by discussing its 2003 decision in *Corbello v. Iowa Production*, 02-826 (La. 2/25/03), 850 So.2d 686.  There, the landowner was awarded $33 million in damages against the former mineral lessee for unauthorized disposal of saltwater and the poor condition of the property.  In affirming, the supreme court articulated:

> A large part of the damages plaintiffs recovered were for restoration of groundwater damage which threatened the Chicot

28

Aquifer, the source of drinking water for Lake Charles, Louisiana. In this court, the mineral lessee argued the appellate court's affirmance of this award to plaintiffs for what is strictly an alleged public injury was error, where the plaintiffs had no legal duty to use the award to restore the property. We found the contamination of the groundwater was both a public injury and a private injury, which would not prevent plaintiffs from collecting damages. [*Corbello*] 850 So.2d at 699.

We noted the legislature had not implemented "a procedure to ensure that landowners will in fact use the money to clean the property." *Id.* We recognized the two opposing public policy concerns which the then-existing state of the law created. At that time, a landowner suing for remediation of contaminated land could sue and receive remediation damages yet, was under no obligation to use the damage award to restore the property. At the same time, there was a strong possibility that land would remain polluted if landowners could not bring suit for remediation. *Id.* [at] 701.

*Corbello* was decided in February of 2003. The legislature responded in the 2003 legislative session by enacting La. R.S. 30:2015.1, effective July 2, 2003, which set forth procedures for the remediation of usable groundwater in the public's interest. In 2006, the legislature extended its remediation procedures into other environmental media by enacting Act 312, which established a procedure to ensure the remediation of oilfield sites and exploration and production sites in La. R.S. 30:29. We now turn to the provisions of the statute at issue and its interpretation.

### *Interpretation of La. R.S. 30:39*

In *Corbello*, we observed *plaintiffs* who were awarded remediation damages *were under no statutory obligation to perform remediation work. The purpose of Act 312 was to create such an obligation.*

*Louisiana Land & Expl. Co.*, 110 So.3d at 1048 (emphasis added).

This last paragraph contains the language on which VPSB relies for its position that the supreme court interprets the statute as placing an obligation on the landowner to perform the remediation work called for in the Most Feasible Plan. I certainly find this argument persuasive, not only because of the italicized language, but because of the supreme court's language and reasoning throughout the opinion. However, we need not reach the question of whether the supreme court intended a

narrow interpretation of the statute or a broad interpretation of the statute. In this case, where UNOCAL has no interest in the property, and, as VPSB points out, no employees of its own, the party with the most interest in getting the remediation accomplished in a timely manner, which is the purpose of Act 312, should be allowed to hire its own contractors to do the work. This is particularly true where this state is subject to hurricanes and tropical storms that fling contamination far beyond its source, to the further detriment of the public health, as pointed out in the testimony at the hearing on the senate bill. In this case, that party is clearly VPSB.

Because the trial court accepted UNOCAL's interpretation of the statute as requiring the responsible party to perform the actual remediation work, and because the statute contains no such requirement, the trial court's judgment is in error. I would reverse the judgment as to form and content and revise it to conform with the observations contained herein.

I respectfully dissent.